

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED

JAN - 5 2004

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

In re ICN Pharmaceuticals, Inc.,
Securities Litigation ) CASE NO. SACV 02-701 DOC (ANx)

)
)
) **ORDER GRANTING DEFENDANTS'**
) **MOTION TO DISMISS PLAINTIFFS'**
) **FIRST AMENDED COMPLAINT**
)
)
)
)
)
)
)
)
)
)

DOCKETED ON CM

JAN - 6 2004

BY _____ 037

Before the Court is Defendants ICN Pharmaceuticals, Inc.'s, Richard Meier's, John Giordani's and Bill MacDonald's motion to dismiss Plaintiffs' consolidated amended complaint. Defendants Milan Panic and PriceWaterhouse Coopers also make separate motions to dismiss Plaintiffs' consolidated amended complaint. After reviewing the moving, opposing and replying papers, hearing oral argument, and for reasons set forth below, the Court GRANTS the motions and (1) dismisses Plaintiffs' complaint as to Defendants ICN Pharmaceuticals, Inc, Richard Meier, John Giordani, Bill MacDonald, and Milan Panic with leave to amend; and (2) dismisses Plaintiffs' complaint as to Defendant Price Waterhouse Coopers without leave to amend.

76

1   Accordingly, the motion by Defendants ICN Pharmaceuticals, Richard Meier, John Giordani,

2   and Bill MacDonald, joined by Defendant Milan Panic to strike certain allegations from the

3   complaint is DENIED as MOOT.  Also, the motion by lead Plaintiff to file a memorandum of

4   law in opposition to Defendants' motion to strike is DENIED as MOOT.

5   **I. BACKGROUND**

6          This action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of

7   1934 (15 U.S.C. §§78j(b) and 78t(a)) (the "Act") and the rules and regulations promulgated

8   thereunder by the SEC, including 17 C.F.R. 240.10b-5 ("Rule 10b-5").  On May 26, 2003,

9   Plaintiffs filed a consolidated amended complaint ("CAC") alleging violations of the Act and

10  Rule 10b-5 on behalf of a class of investors who bought stock in  ICN Pharmaceuticals, Inc.

11  ("ICN") between May 3, 2001 and July 10, 2002 (the "Class Period").  Defendants are ICN,

12  certain of its officers and directors, and Pricewaterhouse Coopers ("PWC"), ICN's auditor.

13  Plaintiffs allege that Defendants improperly engaged in channel stuffing with respect to

14  numerous products to artificially inflate ICN's revenues and earnings.  Plaintiffs allege that

15  Defendants also caused ICN to falsify sales, and accordingly, to record and report revenues that

16  ICN had not earned.

17         Plaintiffs also allege that, during the Class Period, ICN repeatedly touted its growing

18  revenues from ICNRUS (ICN's Russian Operation), ICN's dominance of the Russian

19  pharmaceutical market in both the retail and manufacturing contexts, and promised further

20  investment in Russia to boost its sales, when in fact INCRUS faced serious problems.  Plaintiffs

21  allege that it was apparent to Defendants that ICNRUS operations were materially impaired,

22  such that by the beginning of the Class Period, the revenue and earnings problems called into

23  serious question the value of ICNRUS' manufacturing assets.  This was compounded by a

24  material overstatement of ICNRUS' physical assets, circumstances of which the Defendants

25  were allegedly well aware at the beginning of the Class Period, and of which PWC became

26  aware by summer 2001.

27         In late 2000, ICN began selling laser products, primarily Nlite, through its Photonics

28  Division.  Plaintiffs allege that with knowledge that Nlite was deeply flawed and inferior to

1  competing products, Defendants concealed *its* deficiencies from the investing public.  When

2  sales began to lag, Defendants falsified them by installing Nlite machines in doctors' offices for

3  free and then improperly treating the installation as a sale.

4  　　　　Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), Defendants ICN, and individual

5  Defendants Richard A. Meier ("Meier"), John E. Giordani ("Giordani"), and Bill MacDonald

6  ("MacDonald")  move to dismiss Plaintiffs' CAC.  Defendants Milan Panic ("Panic") and PWC

7  have also filed separate motions to dismiss.

8  　　　　Thus, the issue before the Court is whether the CAC states a claim under the heightened

9  pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15

10  U.S.C. §§78a et seq.

11  **II. DISCUSSION**

12  　　　　The pleading requirements for securities fraud actions are articulated in the PSLRA. 15

13  U.S.C. §§78u-4(b)(1), (2).   "The PSLRA significantly altered pleading requirements in private

14  securities fraud litigation by requiring that a complaint plead with particularity both falsity and

15  scienter." *In re: Vantiv Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v.*

16  *Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).  "The purpose of this heightened pleading

17  requirement was generally to eliminate abusive securities litigation and particularly to put an end

18  to the practice of pleading 'fraud by hindsight.'"  *Id.* at 1084-85 (citing *In re Silicon Graphics*

19  *Sec. Litig.*, 183 F.3d 970, 973 (9th Cir. 1999)).   To meet this heightened pleading requirement,

20  the complaint must "specify each statement alleged to have been misleading, the reason or

21  reasons why the statement is misleading, and, if an allegation regarding the statement or

22  omission is made on information and belief, the complaint shall state with particularity all facts

23  on which that belief is formed." *Id.* at 1085 (citing 15 U.S.C. §§ 78u-4(b)(1)).  The second

24  requirement of the PSLRA is that the complaint must "state with particularity facts giving rise to

25  a *strong inference* that the defendant acted with the required state of mind." *Id.* (citing 15

26  U.S.C. §§ 78u-4(b)(2) (emphasis added)).  "[T]he complaint must allege that the defendant made

27  false or misleading statements either intentionally or with deliberate recklessness. . . ." *Id.*

28  [citations omitted].  Facts showing mere recklessness or a motive and opportunity to commit

1    fraud are not sufficient to establish a strong inference of deliberate recklessness.  Plaintiffs must

2    come closer to demonstrating intent, as opposed to mere motive and opportunity.  *Silicon*

3    *Graphics*, 183 F.3d at 974.  Moreover, under the PSLRA "when determining whether plaintiffs

4    have shown a strong inference of scienter, the court must consider *all* reasonable inferences to

5    be drawn from the allegations, including inferences unfavorable to the plaintiffs.  District courts

6    should consider all the allegations in their entirety, together with any reasonable inferences that

7    can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to

8    the requisite inference of scienter."  *Gompper v. Visx, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)

9    (emphasis added).

10        As against Defendants ICN, Panic, MacDonald, Meier and Giordani, Plaintiffs allege that

11    the Defendants: 1) engaged in channel stuffing throughout the Class Period, 2) regularly falsely

12    reported sales of ICN products during the Class Period, 3) failed to disclose the myriad of

13    business problems facing ICNRUS and failed to write down materially impaired ICNRUS assets,

14    4) engaged in a host of improper practices with respect to the Photonics Division, and 5) violated

15    GAAP.  In support of these allegations, Plaintiffs also allege that the individual Defendants

16    engaged in suspicious insider trading and were motivated by huge bonus payments received

17    upon the completion of the Ribapharm IPO.

18        As against Defendant PWC, Plaintiffs allege that PWC issued a false and misleading

19    audit opinion and quarterly reviews certifying misleading financial statements by ICN as to its

20    Russian operations, with knowledge of adverse facts.

21    **A. Analysis of Plaintiffs' Allegations Against ICN, Panic, MacDonald, Meier, and**

22    **Giordani**

23        **1. Allegations Concerning ICN's Channel stuffing**

24        Plaintiffs first allege that Defendants improperly engaged in channel stuffing with respect

25    to numerous products to artificially inflate ICN's revenues and earnings.  "Channel stuffing is

26    the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in

27    the next quarter as the distributors no longer make orders while they deplete their excess

28    supply."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).  Plantiffs allege

1  Defendants would offer huge discounts at the end of a quarter to increase the sales figures for

2  the quarterly results.

3         Channel stuffing claims are disfavored in this Circuit. *In re Splash Tech. Holdings Inc.,*

4  *Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001) (citing *In re Ashworth, Inc. Sec. Litig.,*

5  2000 WL 33176041, *7 (S.D. Cal.) (citing *Steckman*, 143 F.3d at 1298)).  In *Steckman*, the

6  Ninth Circuit stated that such a "claim is speculation made in hindsight."  *Steckman*, 143 F.3d at

7  1298.  Here, Plaintiffs plead no specific facts to support a conclusion that in this case their claim

8  is not speculation made in hindsight.  The CAC shows nothing more than ICN's business

9  decision to offer discounts to reach its sales targets.  "Channel stuffing claims may have

10 probative value insofar as the channel stuffing was done so as to artificially inflate income, but

11 there may also be other legitimate reasons for attempting to achieve sales earlier." *Broudo v.*

12 *Dura Pharm.'s, Inc.,* 339 F.3d 933, 940 (9th Cir. 2003).  For example, Plaintiffs state that this

13 practice was particularly notable with respect to certain chemotherapy drugs whose normal

14 market was cyclical with the weather and typically sold very poorly during the summer.[1]

15 Plaintiffs allege that particularly in the Spring, the Company would offer incentives for

16 wholesalers to buy more product than they otherwise would.  However, this practice may simply

17 have been done for the purpose of, and had the effect of, evening out sales of the product over

18 the course of the year.  The Court fails to see how this goal is inherently improper and agrees

19 with the observation of the First Circuit in *Greebel v. FTP Software, Inc.,* that "there is nothing

20 inherently improper in pressing for sales to be made earlier than in the normal course." 194 F.3d

21 185, 202 (1st Cir. 1999); *see also Ashworth*, 2000 WL 33176041 at *7.  Finally, as Defendants

22 note, for channel stuffing to be improper logically it must be a short-lived scheme in which the

23 wrongdoer attempts to capitalize on artificially increased sales *before* the resulting drop in sales.

24 If channel stuffing occurs over time, the pattern of increased sales toward the end of each quarter

25 and lower sales at the beginning of each quarter would be quite transparent to investors, and thus

26

27 _____

28     [1] Plaintiffs state this was because the treatments were too painful to tolerate during the hotter months.

1  could not form the basis for an allegation of fraud.  Plaintiffs rely on statements by a former

2  Territory Manager for the Western Region, who states that ICN's channel stuffing started as

3  early as the late 1990s. (CAC ¶ 36.)  Thus, it was clearly an ongoing practice.  For all the above

4  reasons, the Court concludes that the Plaintiffs have not pled any facts from which an inference

5  could be made that the Defendants engaged in improper conduct by engaging in channel

6  stuffing.

7          Even if an inference of illegitimacy could be drawn from the Defendants' behavior,

8  Plaintiffs have not provided corroborating details to meet the heightened pleading standard of

9  the PSLRA.  Although Plaintiffs list the name of two distributors, the CAC generally fails to

10 allege "specific transactions, specific shipments, specific customers, specific times, or specific

11 dollar amounts." *Ashworth*, 2000 WL 33176041 at *6.  Plaintiffs also fail to provide any

12 corroborating details about orders reportedly received by Territory Managers to "load" at the end

13 of each quarter; or sales meetings where channel stuffing was "regularly discussed."

14                    **2. Allegations Concerning ICN's fake sales**

15         Plaintiffs allege that Defendants regularly falsely reported sales of ICN products during

16 the Class Period.  Plaintiffs support these allegations with a statement from a former ICN

17 Territory Manager from the Carolinas region that his actual sales numbers were regularly

18 rejected by ICN in favor of made-up sales figures.  Plaintiffs also allege that in accordance with

19 ICN's policy of "selling no matter what it took," the Defendants not only committed financial

20 fraud, but also created dangerous conditions for patients by promoting "off-label" use of certain

21 ICN pharmaceuticals and by re-dating and selling expired pharmaceuticals.

22         These allegations are also notably lacking in corroborating details.  First, the CAC fails to

23 allege any specifics about discrepancies between the figures reported by the Territory Manager

24 and the figures publicly reported, such as amounts, in what reports, and where in the reports the

25 discrepancies could be identified.  Second, the CAC provides no specifics about transactions,

26 shipments, dates, customers and so on, of sales that were faked or pharmaceuticals that were re-

27 dated.  Third, the CAC provides no corroborating details about sales meetings at which

28 employees who were uncomfortable with the program were allegedly kicked out of the meeting,

1   such as dates, places, names of employees who were kicked out and names of those who did the

2   kicking out. Nor does the CAC provide any details of an email allegedly sent to Panic

3   complaining about this practice, or the names and circumstances of employees who allegedly

4   were fired after complaining about this practice. Thus, as in *Silicon Graphics*, Plaintiffs plead

5   virtually no facts to corroborate their allegations, and instead simply provide a list of sources

6   from whom they allegedly obtained their information. *See Silicon Graphics,* 183 F.3d at 985.

7   Finally, and most basically, the CAC omits mention of the amounts by which ICN purportedly

8   overstated revenues. In the absence of such specifics, the Court cannot ascertain whether there

9   is any basis for the allegation that "ICN's improper means of enhancing revenue were rampant

10  during the Class Period."[2] (Pls.' Opp'n at 12).

### 3. Allegations Concerning Failure to Disclose ICNRUS' Business Problems

11

12  ### and its Materially Impaired Assets

13      Plaintiffs allege that Defendants' concealment of ICNRUS' business problems constitutes

14  fraud. Plaintiffs first allege that the Defendants failed to disclose the deplorable state of

15  ICNRUS' manufacturing facilities. Specifically, they allege that ICN purchased three

16  manufacturing facilities in Russia, and pledged upwards of $1 billion to update the facilities—

17  money that ICN did not have. As a result of ICN's failure to update the facilities, the regional

18  governments from which ICN had purchased the facilities began to assert greater control over

19  the facilities. Moreover, these manufacturing facilities were unproductive, and staffed by

20  approximately 8,000 workers, many of whom were idle, but who could not be fired by ICN

21  under the purchase agreement, resulting in a substantial drain on ICN. None of this was

22  disclosed to the public. Plaintiffs also allege that ICN: failed to anticipate that under normal

23  business conditions in Russia, up to 50% of its inventory would be stolen and resold on the black

24

---

25      [2] Plaintiffs rely on *Schlagal v. Learning Tree Int'l* for the proposition that it is not fatal to
26  the complaint that it does not describe in detail a single specific transaction. 1998 U.S. Dist.
    LEXIS 20306, at *22-23. However, *Schlagal* relies heavily on the Ninth Circuit's determination
27  in *Cooper v. Pickett,* 137 F.3d 616 (9th Cir. 1998). *Cooper* has been superseded, as the Ninth
    Circuit noted in *In re Vantive Corp. Sec. Litig.,* because it was decided under the law as it existed
28  prior to the PSLRA. 283 F.3d 1079, 1091 (9th Cir. 2002).

1  market; INCRUS had other inventory control problems; ICNRUS was ill-equipped to establish a

2  distribution network and was unable to timely distribute pharmaceuticals, thus losing potential

3  customers; and that overall, INCRUS' retail pharmaceutical strategy was unprofitable and

4  unworkable.

5      Plaintiffs also allege that during the Class Period, ICNRUS overvalued 1) its three

6  manufacturing facilities at Yoshkar-Ola, St. Petersburg, and Krsanoyarsk, 2) its manufacturing

7  and distributing operations by at least $40,000,000, 3) its Moscow headquarters by at least

8  $11,333,000, 4) INCRUS' warehouse adjacent to its Oktyabr plant by at least $5,000,000, 5)

9  ICNRUS' warehouse on Vasilevsky Island, and 6) ICNRUS' student hostel building near St.

10 Petersburg.  ICN wrote-down its ICNRUS assets in the third quarter of 2002, but Plaintiffs

11 contend that the Defendants knew or recklessly disregarded adverse circumstances that should

12 have prompted ICN to write-down those assets far earlier.

13     Plaintiffs rely exclusively on assertions by Victor Dorodny ("Dorodny") in support of

14 their allegations regarding ICNRUS.  For example, Plaintiffs allege that "by the end of April,

15 2000, it was clear to Dorodny that the value of the Russian manufacturing facilities owned by

16 ICN was severely impaired." (CAC ¶ 48).  However, at that time, Dorodny represented a

17 competitor of ICN, Gazprom OAO, and had done an analysis of ICN's operations in support of

18 Gazprom's offer to purchase ICN's Russian manufacturing facilities. (CAC ¶ 47).  Dorodny

19 claims that Panic and MacDonald knew that ICN should have extricated itself from its Russian

20 manufacturing operations at that time, but Panic refused to sell. (CAC ¶ 50).  Plaintiffs fail to

21 provide facts indicating why an analysis by a competitor and an offer of purchase translates to

22 ICN or the other defendants having actual or constructive "knowledge" such that ICN

23 fraudulently concealed that its business problems.  Even if ICN was "told" during the

24 negotiations for purchase of all the reasons why it should sell, that information was coming from

25 a party that had divergent interests from ICN.  Plaintiffs also fail to allege Dorodny's expertise

26 with regard to these valuations.

27     Plaintiffs' complaint, as it relates to the ICNRUS allegations, must be dismissed because

28 it does not plead with particularity facts giving rise to a strong inference that the Defendants

1  acted with the required state of mind, i.e. either intentionally or with deliberate recklessness.

2  *Broudo v. Dura Pharmaceuticals, Inc.,* 339 F.3d 933, 938 (9th Cir. 2003).  Indeed, the only facts

3  that Plaintiffs allege as to Defendants' state of mind are contained in Paragraph 77 of the

4  Complaint:

5    According to Dorodny [a former ICN Vice President of Corporate

6    Development], it is highly unlikely that Panic and MacDonald did not know the

7    circumstances of ICNRUS, in detail.  First, MacDonald knew of the

8    manufacturing and distribution problems because Dorodny told him directly.

9    Further, Vasic had Panic's ear.  Panic traveled to Russia once a month and

10   before he arrived Vasic would give him a detailed report of the situation on the

11   ground.  Further, Ortega, whom Dorodny described as a "straight shooter" and

12   a person of integrity, was on the phone with senior ICN personnel in Costa

13   Mesa every night.  According to Dorodny, the contact was even closer around

14   July of 2001 when ICN issued its $525 million offering of 6 1/4% senior

15   convertible notes.  Dorodny remembers that everyone, including Panic, Vasic,

16   MacDonald, and Ortega, was concerned that the truth about ICNRUS could

17   scuttle that deal.  Further, senior ICN personnel including MacDonald and the

18   CFO received daily communications and weekly reports from ICNRUS and

19   responded to those reports with comments and plans to remedy the most acute

20   of ICN's problems.  In turn, Ortega conveyed those comments and plans to

21   remedy problems directly to ICNRUS personnel.  Approximately 90% of those

22   communications with Costa Mesa were via email. . ."

23  As in *Silicon Graphics*, Plaintiffs fail to state specific facts relating to the alleged

24  communications that put ICN management on notice, with the exception of Dorodny's having

25  "told them."  *See Silicon Graphics*, 183 F.3d at 985.  "We would expect that a proper complaint

26  which purports to rely on the existence of internal reports would contain at least some specifics

27  from those reports as well as such facts as may indicate their reliability."  *Id.*  The Court is

28  provided no information about the content of the daily communications and weekly reports, nor

1   the apparently voluminous emails. Plaintiffs note that Ortega, described by Plaintiffs' source

2   Dorodny as a straight shooter, was on the phone every night with senior ICN personnel, but they

3   fail to provide any information about the content of Ortega's communications. Ortega may have

4   had a different view of the alleged problems facing ICNRUS and may have been conveying a

5   very different picture to senior ICN personnel than that painted by Dorodny. Thus, in the

6   absence of additional specifics, the Court cannot ascertain whether there is a basis for alleging

7   that defendants had actual or constructive knowledge of ICNRUS's problems such that any

8   representations to the contrary would have to have been consciously misleading. *Id.* In sum,

9   Plaintiffs have provided insufficient factual allegations to support both the extent of knowledge

10  and the inference that the failure to recognize the alleged problems "was attributable to fraud,

11  rather than a lack of caution, a lack of solid information, a belief that it was part of the

12  company's grand expansion plans, or a momentary surplus of hubris." *See In re Guess?, Inc.*

13  *Sec. Litig.*, 174 F. Supp. 2d 1067, 1078 (C.D. Cal. 2001). Thus, Plaintiffs' allegations do not

14  comprise the kind of "strong circumstantial evidence" needed to establish that Defendants made

15  false or misleading statements either intentionally or with deliberate recklessness.

16      The same is true regarding the allegations pertaining failure to disclose impaired material

17  assets. Plaintiffs only speculate about when Defendants came to know about the impaired assets,

18  and although they identify the assets that were impaired, they do not specify the amount by

19  which a number of these assets (ICNRUS' three manufacturing facilities at Yoshkar-Ola, St.

20  Petersburg, and Krsanoyarsk, ICNRUS' warehouse on Vasilevsky Island and ICNRUS' building

21  near St. Petersburg) were impaired, and provide no factual support for the figures by which they

22  allege other assets were impaired. Plaintiffs specify neither the purchase price and carrying

23  values of these properties, nor the expected income stream from these properties. At oral

24  argument, Plaintiffs directed the Court to *In re Vivendi Universal, S.A. Sec. Litig.*, 2003 WL

25  22489764 (S.D.N.Y.), for the proposition that other factors are sufficient to show that assets

26  should be discounted. However, the Court finds that in *In re Vivendi*, Plaintiffs provided

27  specific corroborating details, such as a memo prepared by Vivendi detailing that marketing

28  rights to soccer contracts were not bona fide assets, as originally believed, and thus should be

1  written off in Vivendi's year-end statement for the 2000 fiscal year, but they were not written

2  off. Id. at *12.[3] Moreover, Plaintiffs have made no allegations that would demonstrate that ICN

3  had an obligation under GAAP to impair its assets at a specific earlier time, but chose not to do

4  so with an intent to defraud. Plaintiffs variously contend that "it was apparent by mid-2000 that

5  ICNRUS operations were materially impaired (CAC ¶ 93) and "Defendants knew these assets

6  were improperly valued because Dorodny conducted an inspection and informed defendants of

7  the improper evaluation by mid-2001." (Pls.' Opp'n at 16). Unlike a case in which the court

8  found sufficient pleading detail, Plaintiffs have failed both to substantiate that Defendants

9  committed a violation of GAAP and have failed to provide detailed evidence of the

10  contemporaneous decision-making behind the alleged accounting errors that would combine to

11  show the required scienter. See In re Adaptive Broadband Sec. Litig., 2002 U.S. Dist. LEXIS

12  5887, at *41 (N.D. Cal. 2002). Plaintiffs have therefore not pled with particularity as required

13  under Silicon Graphics and its progeny. Furthermore, even a delinquent write-down of the

14  impaired assets, without anything more, does not state a claim of securities fraud, stating at best

15  a bad business decision.

16      Also, Plaintiffs admit that, in 2000 and 2001 ICN expanded its manufacturing and

17  distribution network to become a leading pharmaceutical company in Russia (CAC ¶¶ 42-43),

18  and that ICN slashed its losses from $17 million to $4 million and improved its market position

19  (Id. at ¶ 68). Given these facts, it is equally plausible that ICN did not impair assets during the

20  Class Period because it believed that it was successfully addressing problems and its business

21  prospects were bright. Plaintiffs have thus not alleged with particularity facts giving rise to a

22  strong inference that the Defendants acted either intentionally or with deliberate recklessness.

23      **4. Allegations Concerning ICN's Laser-Based Products**

24      Plaintiffs allege that ICN hid the fact that its product NLite was flawed and patently

25  inferior to competing laser products from the investing public. The NLite system cost 20-30%

26

27  _____

28  [3] The Court also notes that the Second Circuit has different pleading standards under the
   PSLRA than the Ninth Circuit.

1  more than competing products, which were far superior even when cost was not taken into
2  consideration.  Plaintiffs allege that numerous ICN employees stated that the product was deeply
3  flawed and that they were instructed by their superiors to conceal this from ICN's customers.
4  Plaintiffs allegations are very similar to allegations dismissed by the court in *In re Vantive Corp.*
5  *Sec. Litig.* and fail on the same grounds:

6  > Similar deficiencies inhere in the complaint's allegations that the defendants lied
7  > when representing that Vantive 'was successfully developing/had successfully
8  > introduced Vantive Sales (Version 7) for release.'  There are simply no details in
9  > the allegations that would make these representations false—allegations that
10 > Vantive Version 7 'was not well received by customers, was known to be a
11 > 'disaster' inside the Company, as several of its software modules did not work
12 > properly' that deployment of the product resulted in 'serious problems' for Vantive
13 > sales operations, 'requiring the investment of significant management
14 > resources...to cure these operational problems' and that Vantive 7 was 'not
15 > commercially viable due to defects in the product.'  Nor are any corroborating
16 > facts alleged, or sources stated, for the allegation that Luongo 'secretly ordered'
17 > that Vantive 7 not be sold and that it be used as a pilot product until Vantive 7.5
18 > could be introduced."

19 283 F.3d 1079, 1088 (9th Cir. 2002).

20      Plaintiffs also allege that ICN would install NLite machines for free and fraudulently
21 book the transaction as a sale, thus inflating the appearance of revenue.  ICN would resell
22 defective and expired returned cartridge dye kits used in the NLite machines to another
23 customer, thus creating the appearance of revenue from the cartridge.  These allegations are far
24 too general to satisfy the requirements of the PSLRA.  Among necessary corroborating facts
25 missing from Plaintiffs complaint are: i) names of customers, ii) dates, times and locations of
26 free uses, returns, or resales, and iii) the amounts by which such transactions purportedly
27 overstated ICN's revenues.  See, e.g., *Vantive*, 283 F.3d at 1091; *In re Ashworth, Inc. Sec. Litig.*,
28 2000 WL 33176041, at *16-17 (S.D. Cal.); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204

1 (1st Cir. 1999).

2      Finally, Plaintiffs claim that ICN commingled its books with the Photonics division after

3 its spin-off to conceal or obscure losses.  These allegations are also devoid of the requisite

4 corroborating details, such as the dollar amounts in question, the nature of the assets, or the

5 identities of ICN employees who allegedly perpetrated acts of fraud.

6      **5.  Allegations Concerning Accounting Fraud**

7      Plaintiffs allege that ICN committed accounting fraud by violating GAAP in the

8 following manners:

9      1.  By overstating revenue from sales of equipment that were given to physicians for free.

10         (CAC ¶¶ 87, 91).

11      2.  By reporting revenue from pre-shipped orders. (CAC ¶ 87).

12      3.  By recording sales from deeply discounted products with rights of return and extended

13         payment terms.  (CAC ¶ 92).

14      4.  By failing to assess and record the impairment charge on the Russian properties in the

15         proper time period.  (CAC ¶¶ 93-96).

16      5.  By failing to properly record expenses.  (CAC ¶ 97).

17      GAAP violations must be pled with particularity.  *Lovelace v. Software Spectrum, Inc.*, 78

18 F.3d 1015, 1021 (5th Cir. 1996).  As discussed above, Plaintiffs' allegations are conclusory and

19 do not state the requisite specifics, including particular transactions in which revenues were

20 improperly recorded, including the names of the customers, the terms of specific transactions,

21 when the transactions occurred, and the approximate amount of the fraudulent transactions.

22 Most important, Plaintiffs do not state the "approximate amount by which revenues and earnings

23 were overstated"—a necessary "basic detail" in accounting fraud allegations.  *Vantive*, 283 F.3d

24 at 1091 (citing *Greebel*, 194 F.3d at 204).

25      **6.  Scienter Allegations**

26      *a.  Analysis of Allegations of Insider Trading*

27      Plaintiffs allege that certain sales of ICN stock by Defendants Panic, MacDonald, Meier,

28 and Giordani raise an inference of scienter.

1    Unusual or suspicious stock sales by corporate insiders may constitute circumstantial

2  evidence of scienter. *Silicon Graphics*, 183 F.3d at 986.  A suspicious sale is one that is

3  "dramatically out of line with prior trading practices at times calculated to maximize the personal

4  benefit from undisclosed inside information." *Id.* (citing *In re Apple Comp. Sec. Litig.*, 886 F.2d

5  1109, 1117 (9th Cir. 1989)).  "Among the relevant factors to consider are: (1) the amount and

6  percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were

7  consistent with the insider's prior trading history." *Id.*

8    Defendant Panic

9    Panic sold between $23,500,00 and $31,000,000 worth of ICN stock between June 11-14,

10  2002.  Plaintiffs allege that over the "six years preceding the Class Period, [Panic] sold a mere

11  20% of the total number of shares that he sold in the six months preceding the Company's July

12  11, 2002 disclosure that caused the Company's stock to plummet." (CAC ¶181).

13    However, as the CAC notes, on June 12, 2002, dissident shareholders were successful in

14  having all of their nominees elected to ICN's board, which precipitated Panic's immediate

15  retirement as CEO.  (CAC ¶¶ 167, 168).  Interestingly, according to the CAC, the proxy fight

16  was initiated because two large institutional investors believed ICN's stock traded as a

17  significant *discount* to its intrinsic value.  (CAC ¶ 145).  In any event, the Court concludes that

18  Plaintiffs have not shown sufficient facts to demonstrate that Panic's sale raises an inference of

19  scienter in the context of his resignation as Chairman and Chief Executive Officer of ICN on the

20  same date as the sale of his stock, in the wake of a losing proxy battle.

21    Defendants MacDonald, Meier and Giordani

22    Meier sold all of his 3,500 shares of ICN stock on November 26, 2001 for a net proceed

23  of $100,000.  Giordani sold between $3,900,00 and $5,100,000 worth of ICN stock on June 11,

24  2002, and MacDonald sold between $5,000,00 and $6,600,000 worth of ICN stock on June 14,

25  2002.  The Complaint does not offer any information about the prior trading history of any of the

26

27

28

1  three, without which it is difficult to determine the context in which the sales were made.[4]  See

2  *Vantive*, 283 F.3d at 1095 ("When a complaint fails to provide us with a meaningful trading

3  history for the purposes of comparison, we have been reluctant to attribute significance to the

4  defendant's stock sales. . . .").

5    As to Meier's sale, which was for a tiny percentage of the total allegedly suspicious

6  insider sales, and occurred about seven months before the Company's July 11, 2002 disclosure,

7  Plaintiffs fail to allege facts demonstrating that the timing and amount of this sale is suspicious.

8  *See Silicon Graphics*, 183 F.3d at 987 (Defendant's sales represented an insignificant portion of

9  the allegedly suspicious sales and thus did not give rise to a strong inference of deliberate

10  recklessness).

11    As to Giordani and MacDonald, the stock sales could potentially be suspicious.

12  However, Plaintiffs fail to plead additional facts to support their contention.  In particular,

13  Plaintiffs do not provide facts regarding the sales as a percentage of each individual's total

14  holdings. *See Silicon Graphics*, 183 F.3d at 986 ("[T]he proportion of shares actually sold by an

15  insider to the volume of shares he could have sold is probative of whether the sale was unusual

16  or suspicious.")  Also, Giordani and MacDonald were both Executive Vice Presidents of ICN.

17  Thus, as Defendants note, they were also facing major uncertainty as to the direction of the

18  company and the prospects for their own continued employment in the wake of the losing proxy

19  battle and Panic's resignation.  Plaintiffs do not address the context surrounding the sales.  Thus,

20  the Court concludes that Plaintiffs have not shown sufficient facts to demonstrate that Giordani's

21  and MacDonald's stock sales raise an inference of scienter in light of these other crucial facts,

22  and particularly since there is no allegation that the proxy battle itself was undertaken because of

23  concerns about fraud and mismanagement. Finally, Plaintiffs make no allegations connecting

24

25    [4] Plaintiffs seek to cure their omission by contending in their opposition papers that
26  MacDonald had traded no ICN shares for two years preceding his June 2002 sale (Pls.' Opp'n at
   39), and Meier had traded no ICN shares for ten months preceding his November 2001 sale (Pls.'
27  Opp'n at 40).  However, the Court must disregard these facts, since it is "constrained to consider
   the sufficiency of allegations contained in the complaint, not in Plaintiffs' opposition papers."
28  *Moskowitz v. Vitalink Comm. Corp.*, 751 F. Supp. 155, 157 (N.D. Cal. 1990).

1  Giordani and MacDonald with the allegedly misleading statements. Thus, Plaintiffs do not plead

2  adequate facts as to their claim of insider trading.

3                  *b. Allegations Regarding the Ribapharm Bonus*

4          Plaintiffs allege that Defendants Panic, MacDonald, Giordani, and Meier were motivated

5  to engage in fraudulent accounting practices to receive the following bonuses in connection with

6  the successful completion of the Ribapharm IPO: Panic -- $33,050,000; MacDonald –

7  $2,000,000; nine non-executive directors – $330,500 each.[5] (CAC ¶ 150). They allege that

8  Defendants committed securities fraud to make ICN appear stable and profitable, so that the

9  Ribapharm IPO could be completed and they could receive their bonuses. (*Id.* ¶ 178).

10  While Plaintiffs' allegations state a motive for the Defendants to commit securities fraud,

11  Plaintiffs' complaint, when taken as a whole, fails to plead anything more than mere motive and

12  opportunity to commit fraud, which is not sufficient to establish a strong inference of deliberate

13  recklessness. *Silicon Graphics*, 183 F.3d at 973. Plaintiffs have not pled with particularity facts

14  giving rise to a strong inference that the Defendants acted either intentionally or with deliberate

15  recklessness.

16  **B. Allegations against PWC**

17          PWC was engaged by ICN to provide independent auditing and accounting services.

18  Plaintiffs allege that PWC knew or was reckless in not knowing that ICN's financial statements

19  were prepared in violation of GAAP and were false and misleading.

20          A plaintiff alleging a violation of Section 10(b) and Rule 10b-5 against an independent

21  auditor such as PWC must satisfy the requirements of the PSLRA by alleging with specificity

22  that "the accounting practices were so deficient that the audit amounted to no audit at all, or an

23  egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting

24  judgments which were made were such that no reasonable accountant would have made the

25  same decisions if confronted with the same facts." *DSAM Global Value Fund v. Altris Software*,

26

27        [5] The Complaint makes no mention of any bonus payments received by either

28  Meier or Giordani.

1   *Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407,

2   1426-27 (9th Cir.1994)). The "mere publication of inaccurate accounting figures, or a failure to

3   follow GAAP, without more, does not establish scienter." *Id.* To allege a "strong inference of

4   deliberate recklessness," Plaintiffs "must state facts that come closer to demonstrating intent, as

5   opposed to mere motive and opportunity." *Id.* (citing *Silicon Graphics*, 183 F.3d at 974).

6   In *DSAM*, the Ninth Circuit held as inadequate, allegations against the independent auditor that it

7   must have "consciously disregarded the improper revenue recognition because it had access to

8   the documents that revealed [the company's] improper revenue recognition at the very time it

9   conducted the original audit." *Id.* The Court found that, that fact by itself did not "strongly

10  compel an inference of intentional or deliberately reckless conduct as opposed to ordinary

11  carelessness." *Id.*

12       In contrast, in *In re Homestore.com*, the court, reasoned that the auditor's actually having

13  itself questioned certain transactions and having objected to others indicated that the auditors

14  knew of the questionable nature of the company's accounting, and found Plaintiffs' pleadings

15  adequate. 252 F. Supp. 2d, 1018, 1042 (C.D. Cal. 2003). The Court held that the auditor "acted

16  with deliberate indifference, if not conscious misconduct, when it refused to see the obvious, or

17  *to investigate the doubtful, improper transactions and revenue recognition carried out. . . ." Id.* at

18  1043.

19       In this case, Plaintiffs allege that Dorodny inquired of a PWC partner, "Tony," regarding

20  the recorded values of several of the properties located in Russia. Dorodny states that Tony and

21  his staff were completely unaware of the values of the buildings or whether supporting

22  information existed for those values. Plaintiffs allege that PWC never did an appropriate

23  investigation to determine the value of ICNRUS' assets and whether they should have been

24  impaired.

25       The Court finds that Plaintiffs' allegations, while perhaps sufficient to show carelessness,

26  do not give rise to a strong inference that the firm acted with intent to defraud, conscious

27  misconduct, or deliberate reckless, and thus are insufficient to plead scienter under PSLRA.

28  See, *DSAM*, 288 F.3d at 389. Allegations that PWC failed to investigate the true values of the

1 | Russian assets based on one incident of Dorodny making an inquiry of a PWC partner cannot

2 | establish scienter.

3 | ### C. Totality of the Allegations

4 | The Court finds, considering the allegations as a whole, that Plaintiffs have failed to plead

5 | with requisite particularity factual allegations of wrongdoing, and factual allegations necessary

6 | to establish that Defendants acted with the required state of mind.

7 | ## III. DISPOSITION

8 | For the foregoing reasons, the Court DISMISSES WITH LEAVE TO AMEND Plaintiffs'

9 | Consolidated Amended Complaint as to Defendants ICN, Panic, Meier, MacDonald, and

10 | Giordani. As to Defendant PWC, the Court finds that amendment would be futile and

11 | DISMISSES WITHOUT LEAVE TO AMEND. The Court grants Plaintiffs 30 days to amend

12 | their complaint.

13 |

14 | IT IS SO ORDERED.

15 | DATED: January 5, 2004

16 |

17 |

18 | DAVID O. CARTER
United States District Judge

18