___ Priority
___ Send
___ Clsd
___ Enter
___ JS-5/JS-6
___ JS-2/JS-3

FILED

JUN 2 4 2004

CLERK U S DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION
                                    DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ICN Pharmaceuticals, Inc., Securities Litigation | CASE NO. SACV 02-701 DOC (ANx) |
| | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT |

DOCKETED ON CM

JUN 2 4 2004

BY _____ 037

Before the Court is Defendants ICN Pharmaceuticals, Inc 's, Richard Meier's, John Giordani's and Bill MacDonald's motion to dismiss Plaintiffs' second consolidated amended complaint   Defendant Milan Panic also makes a separate motion to dismiss Plaintiffs' second consolidated amended complaint   After reviewing the moving, opposing and replying papers, hearing oral argument, and for reasons set forth below, the Court GRANTS the motions and dismisses Plaintiffs' complaint as to Defendants ICN Pharmaceuticals, Inc, Richard Meier, John Giordani, Bill MacDonald, and Milan Panic partially with leave to amend and partially without leave to amend   Accordingly, the motion by Defendants ICN Pharmaceuticals, Richard Meier,

(112)

1  John Giordani, and Bill MacDonald, joined by Defendant Milan Panic to strike certain

2  allegations from the complaint is DENIED as MOOT

3  **I. BACKGROUND**

4  This action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of

5  1934 (15 U S C §§78j(b) and 78t(a)) (the "Act") and the rules and regulations promulgated

6  thereunder by the SEC, including 17 C F R 240 10b-5 ("Rule 10b-5")  On May 26, 2003,

7  Plaintiffs filed a consolidated amended complaint ("CAC") alleging violations of the Act and

8  Rule 10b-5 on behalf of a class of investors who bought stock in ICN Pharmaceuticals, Inc

9  ("ICN") between May 3, 2001 and July 10, 2002 (the "Class Period")  Defendants are ICN and

10  certain of its officers and directors

11  The CAC was dismissed by this Court in its entirety on January 5, 2004  On February 9,

12  2004, Plaintiffs filed a Second Consolidated Amended Complaint ("SCAC") which is the subject

13  of this motion to dismiss

14  Plaintiffs allege that Defendants improperly engaged in channel stuffing with respect to

15  numerous products to artificially inflate ICN's revenues and earnings  Plaintiffs allege that

16  Defendants also caused ICN to falsify sales, and accordingly, to record and report revenues that

17  ICN had not earned

18  Plaintiffs further allege that Defendants improperly marketed ICN's drug, Efudex, for

19  once-a-day application when the Food and Drug Administration had only approved Efudex for

20  twice-a-day application  Plaintiffs allege that this "off-label" marketing artificially inflated

21  Efudex sales in a way that Defendants knew was unsustainable and that Defendants did not

22  disclose the off-label marketing or later adverse actions by the FDA to investors

23  Plaintiffs also allege that, during the Class Period, ICN repeatedly touted its growing

24  revenues from ICNRUS (ICN's Russian Operation), ICN's dominance of the Russian

25  pharmaceutical market in both the retail and manufacturing contexts, and promised further

26  investment in Russia to boost its sales, when in fact INCRUS faced serious problems  Plaintiffs

27  allege that it was apparent to Defendants that ICNRUS operations were materially impaired,

28  such that by the beginning of the Class Period, the revenue and earnings problems called into

1   serious question the value of ICNRUS' manufacturing assets  This was compounded by a

2   material overstatement of ICNRUS' physical assets, circumstances of which the Defendants

3   were allegedly well aware at the beginning of the Class Period, and of which PWC became

4   aware by summer 2001

5          In late 2000, ICN began selling laser products, primarily Nlite, through its Photonics

6   Division  Plaintiffs allege that with knowledge that Nlite was deeply flawed and inferior to

7   competing products, Defendants concealed its deficiencies from the investing public  When

8   sales began to lag, Defendants falsified them by installing Nlite machines in doctors' offices for

9   free and then improperly treating the installation as a sale

10          Pursuant to Fed  R  Civ  P  9(b) and 12(b)(6), Defendants ICN, and individual

11  Defendants Richard A  Meier ("Meier"), John E  Giordani ("Giordani"), and Bill MacDonald

12  ("MacDonald")  move to dismiss Plaintiffs' CAC  Defendant Milan Panic ("Panic") has also

13  filed a separate motion to dismiss

14          Thus, the issue before the Court is whether the SCAC states a claim under the heightened

15  pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15

16  U S C  §§78a et seq

17  **II. DISCUSSION**

18          The pleading requirements for securities fraud actions are articulated in the PSLRA  15

19  U S C  §§78u-4(b)(1), (2)   "The PSLRA significantly altered pleading requirements in private

20  securities fraud litigation by requiring that a complaint plead with particularity both falsity and

21  scienter " *In re  Vantiv Corp  Sec  Litig* , 283 F 3d 1079, 1084 (9th Cir  2002) (citing *Ronconi v*

22  *Larkin*, 253 F 3d 423, 429 (9th Cir  2001))  "The purpose of this heightened pleading

23  requirement was generally to eliminate abusive securities litigation and particularly to put an end

24  to the practice of pleading 'fraud by hindsight '"  *Id*  at 1084-85 (citing *In re Silicon Graphics*

25  *Sec  Litig* , 183 F 3d 970, 973 (9th Cir  1999))  To meet this heightened pleading requirement,

26  the complaint must "specify each statement alleged to have been misleading, the reason or

27  reasons why the statement is misleading, and, if an allegation regarding the statement or

28  omission is made on information and belief, the complaint shall state with particularity all facts

1  on which that belief is formed " *Id* at 1085 (citing 15 U S C §§ 78u-4(b)(1))  The second

2  requirement of the PSLRA is that the complaint must "state with particularity facts giving rise to

3  a *strong inference* that the defendant acted with the required state of mind " *Id* (citing 15

4  U S C §§ 78u-4(b)(2) (emphasis added))  "[T]he complaint must allege that the defendant made

5  false or misleading statements either intentionally or with deliberate recklessness        " *Id*

6  [citations omitted]  Facts showing mere recklessness or a motive and opportunity to commit

7  fraud are not sufficient to establish a strong inference of deliberate recklessness  Plaintiffs must

8  come closer to demonstrating intent, as opposed to mere motive and opportunity  *Silicon*

9  *Graphics*, 183 F 3d at 974  Moreover, under the PSLRA "when determining whether plaintiffs

10  have shown a strong inference of scienter, the court must consider *all* reasonable inferences to

11  be drawn from the allegations, including inferences unfavorable to the plaintiffs  District courts

12  should consider all the allegations in their entirety, together with any reasonable inferences that

13  can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to

14  the requisite inference of scienter " *Gompper v Visx, Inc*, 298 F 3d 893, 897 (9th Cir 2002)

15  (emphasis added)

16       As against Defendants ICN, Panic, MacDonald, Meier and Giordani, Plaintiffs allege that

17  the Defendants  1) engaged in channel stuffing throughout the Class Period, 2) regularly falsely

18  reported sales of ICN products during the Class Period, 3) failed to disclose "off-label"

19  marketing practices related to the Efudex product, 4) failed to disclose the myriad of business

20  problems facing ICNRUS and failed to write down materially impaired ICNRUS assets, 5)

21  engaged in a host of improper practices with respect to the Photonics Division, and 6) violated

22  GAAP  In support of these allegations, Plaintiffs also allege that the individual Defendants

23  engaged in suspicious insider trading

24       **A. Analysis of Plaintiffs' Allegations**

25            **1. Allegations Concerning ICN's Channel Stuffing**

26       Plaintiffs' channel stuffing claims were dismissed without prejudice from their first

27  consolidated amended complaint  Plaintiffs again allege that Defendants improperly engaged in

28  channel stuffing with respect to numerous products to artificially inflate ICN's revenues and

4

1   earnings  "Channel stuffing is the oversupply of distributors in one quarter to artificially inflate

2   sales, which will then drop in the next quarter as the distributors no longer make orders while

3   they deplete their excess supply " *Steckman v  Hart Brewing, Inc* , 143 F 3d 1293, 1298 (9th Cir

4   1998)  Plaintiffs allege Defendants would offer huge discounts at the end of a quarter to increase

5   the sales figures for the quarterly results  As Plaintiffs have added little to nothing to their

6   previously dismissed channel stuffing allegations, the Court repeats many of its prior statements

7   regarding these allegations and dismisses them with prejudice

8           Channel stuffing claims are disfavored in this Circuit  *In re Splash Tech  Holdings Inc* ,

9   *Sec  Litig* , 160 F  Supp  2d 1059, 1076 (N D  Cal  2001) (citing *In re Ashworth, Inc  Sec  Litig* ,

10  2000 WL 33176041, *7 (S D  Cal ) (citing *Steckman*, 143 F 3d at 1298))  In *Steckman*, the

11  Ninth Circuit stated that such a "claim is speculation made in hindsight " *Steckman*, 143 F 3d at

12  1298

13          Here, Plaintiffs plead no specific facts to support a conclusion that in this case their claim

14  is not speculation made in hindsight  The SCAC shows nothing more than ICN's business

15  decision to offer discounts to reach its sales targets  "Channel stuffing claims may have

16  probative value insofar as the channel stuffing was done so as to artificially inflate income, but

17  there may also be other legitimate reasons for attempting to achieve sales earlier " *Broudo v*

18  *Dura Pharm 's, Inc* , 339 F 3d 933, 940 (9th Cir  2003)  For example, Plaintiffs state that this

19  practice was particularly notable with respect to certain chemotherapy drugs whose normal

20  market was cyclical with the weather and typically sold very poorly during the summer [1]

21  Plaintiffs allege that particularly in the Spring, the Company would offer incentives for

22  wholesalers to buy more product than they otherwise would  However, this practice may simply

23  have been done for the purpose of, and had the effect of, evening out sales of the product over

24  the course of the year  The Court fails to see how this goal is inherently improper and agrees

25  with the observation of the First Circuit in *Greebel v  FTP Software, Inc* , that "there is nothing

26

27  _____

28  [1]  Plaintiffs state this was because the treatments were too painful to tolerate during the
    hotter months

1 | inherently improper in pressing for sales to be made earlier than in the normal course " 194 F 3d

2 | 185, 202 (1st Cir 1999)

3 |      Even if an inference of illegitimacy could be drawn from the Defendants' behavior,

4 | Plaintiffs have not provided corroborating details to meet the heightened pleading standard of

5 | the PSLRA   Although Plaintiffs list the name of two distributors, the SCAC generally fails to

6 | allege "specific transactions, specific shipments, specific customers, specific times, or specific

7 | dollar amounts " *Ashworth*, 2000 WL 33176041 at *6   Plaintiffs also fail to provide any

8 | corroborating details about orders reportedly received by Territory Managers to "load" at the end

9 | of each quarter, or sales meetings where channel stuffing was "regularly discussed "

10 |      As Plaintiffs have made virtually no attempt to add the necessary specificity to their

11 | "channel stuffing" allegations since those allegations were dismissed the first time, there is no

12 | reason to believe that these deficiencies can be remedied   Therefore, the channel stuffing

13 | allegations, SCAC ¶ 117, are dismissed with prejudice

14 |      **2. Allegations Concerning ICN's Fake Sales**

15 |      As in the CAC, Plaintiffs allege "fake sales" by ICN   Once again, these allegations are

16 | virtually devoid in the necessary specificity required for pleading fraud   The Court repeats many

17 | of its observations from the order dismissing the CAC

18 |      Plaintiffs allege that Defendants regularly falsely reported sales of ICN products during

19 | the Class Period   (SCAC ¶¶ 69(a)(iv - v) )   Plaintiffs support these allegations with a statement

20 | from a former ICN Territory Manager from the Carolinas region that his actual sales numbers

21 | were regularly rejected by ICN in favor of made-up sales figures   Plaintiffs also allege that in

22 | accordance with ICN's policy of "selling no matter what it took," the Defendants not only

23 | committed financial fraud, but also created dangerous conditions for patients by promoting "off-

24 | label" use of certain ICN pharmaceuticals and by re-dating and selling expired pharmaceuticals

25 |      These allegations are also notably lacking in corroborating details   First, the SCAC fails

26 | to allege any specifics about discrepancies between the figures reported by the Territory

27 | Manager and the figures publicly reported, such as amounts, in what reports, and where in the

28 | reports the discrepancies could be identified   Second, the SCAC provides no specifics about

1    transactions, shipments, dates, customers and so on, of sales that were faked or pharmaceuticals
2    that were re-dated   Third, the SCAC provides no corroborating details about sales meetings at
3    which employees who were uncomfortable with the program were allegedly kicked out of the
4    meeting, such as dates, places, names of employees who were kicked out and names of those
5    who did the kicking out   Nor does the SCAC provide any details of an email allegedly sent to
6    Panic complaining about this practice, or the names and circumstances of employees who
7    allegedly were fired after complaining about this practice   Thus, as in *Silicon Graphics*,
8    Plaintiffs plead virtually no facts to corroborate their allegations, and instead simply provide a
9    list of sources from whom they allegedly obtained their information   *See Silicon Graphics,* 183
10   F 3d at 985   Finally, and most basically, the SCAC omits mention of the amounts by which ICN
11   purportedly overstated revenues   In the absence of such specifics, the Court cannot ascertain
12   whether there is any basis for Plaintiffs' allegations

13          As with the channel stuffing allegations, Plaintiffs have made virtually no attempt to add
14   the necessary specificity to their "fake sales" allegations since those allegations were dismissed
15   the first time   Therefore, there is no reason to believe that these deficiencies can be remedied,
16   and the "fake sales" allegations, SCAC ¶¶ 69(a)(iv - v), are dismissed with prejudice

### 3. Allegations Concerning Off-Label Promotion of Efudex

18          Plaintiffs allege that ICN was promoting its drug, Efudex, for "off-label" use
19   Specifically, the SCAC states that ICN marketed topical Efudex for once-a-day application
20   rather than the twice-a-day application that had been found to be safe and effective by the Food
21   and Drug Administration   (See SCAC ¶¶ 69(a)(i-iii) )   Plaintiffs allege that investors were never
22   informed of the off-label marketing or of the FDA's later letter ordering ICN to cease such
23   marketing

24          As Defendants point out, violation of FDA guidelines in and of itself is not securities
25   fraud   Non-disclosure of off-label marketing might constitute a misleading omission in certain
26   circumstances   Of course, a plaintiff must still connect the misleading omission to the necessary
27   scienter for securities fraud   In this case, even assuming for the purposes of this motion that the
28   falsity allegations are pled with the requisite specificity, Plaintiffs have made no attempt to

1   connect the off-label marketing with the scienter necessary for securities fraud   Plaintiffs argue

2   that they have properly pled scienter because they have pled that ICN conducted sessions to train

3   personnel to sell Efudex for off-label use and that senior ICN officials instructed such marketing

4   to take place   (See SCAC ¶ 69(a)(iii) )  But this argument only tends to show that ICN intended

5   to sell Efudex off-label, not that ICN intended to engage in securities fraud   There is a critical

6   distinction between an intent to skirt FDA regulations and having the state of mind to

7   fraudulently deceive investors   Plaintiff may have adequately pled the former, but has made no

8   showing of the latter   Since Plaintiffs' general allegations of scienter also fail, as seen below,

9   Plaintiffs have not properly pled securities fraud from the non-disclosure of any off-label

10  marketing of Efudex

11              **4. Allegations Concerning Failure to Disclose ICNRUS' Business Problems**

12                          **and its Materially Impaired Assets**

13          Plaintiffs allege that Defendants' concealment of ICNRUS' business problems constitutes

14  fraud   Plaintiffs first allege that the Defendants failed to disclose the deplorable state of

15  ICNRUS' manufacturing facilities   Specifically, they allege that ICN purchased three

16  manufacturing facilities in Russia, and pledged upwards of $1 billion to update the facilities—

17  money that ICN did not have   As a result of ICN's failure to update the facilities, the regional

18  governments from which ICN had purchased the facilities began to assert greater control over

19  the facilities   Moreover, these manufacturing facilities were unproductive, and staffed by

20  approximately 8,000 workers, many of whom were idle, but who could not be fired by ICN

21  under the purchase agreement, resulting in a substantial drain on ICN   None of this was

22  disclosed to the public   Plaintiffs also allege that ICN   failed to anticipate that under normal

23  business conditions in Russia, up to 50% of its inventory would be stolen and resold on the black

24  market, INCRUS had other inventory control problems, ICNRUS was ill-equipped to establish a

25  distribution network and was unable to timely distribute pharmaceuticals, thus losing potential

26  customers, and that overall, INCRUS' retail pharmaceutical strategy was unprofitable and

27  unworkable

28          Plaintiffs also allege that during the Class Period, ICNRUS overvalued 1) its three

1  manufacturing facilities at Yoshkar-Ola, St Petersburg, and Krsanoyarsk, 2) its manufacturing

2  and distributing operations by at least $40,000,000, 3) its Moscow headquarters by at least

3  $11,333,000, 4) INCRUS' warehouse adjacent to its Oktyabr plant by at least $5,000,000, 5)

4  ICNRUS' warehouse on Vasilevsky Island, and 6) ICNRUS' student hostel building near St

5  Petersburg  ICN wrote-down its ICNRUS assets in the third quarter of 2002, but Plaintiffs

6  contend that the Defendants knew or recklessly disregarded adverse circumstances that should

7  have prompted ICN to write-down those assets far earlier

8         Plaintiffs rely exclusively on assertions by Victor Dorodny ("Dorodny") in support of

9  their allegations regarding ICNRUS  For example, Plaintiffs allege that "by the end of April,

10  2000, it was clear to Dorodny that the value of the Russian manufacturing facilities owned by

11  ICN was severely impaired " (SCAC ¶ 69(b)(v))  However, at that time, Dorodny represented a

12  competitor of ICN, Gazprom OAO, and had done an analysis of ICN's operations in support of

13  Gazprom's offer to purchase ICN's Russian manufacturing facilities  (CAC ¶ 69(b)(ii))

14  Dorodny claims that Panic and MacDonald knew that ICN should have extricated itself from its

15  Russian manufacturing operations at that time, but Panic refused to sell  (CAC ¶ 69(b)(vii))

16  Plaintiffs fail to provide facts indicating why an analysis by a competitor and an offer of

17  purchase translates to ICN or the other defendants having actual or constructive "knowledge"

18  such that ICN fraudulently concealed its business problems  Even if ICN was "told" during the

19  negotiations for purchase of all the reasons why it should sell, that information was coming from

20  a party that had divergent interests from ICN [2]

21         In early 2001, Dorodny was hired by ICNRUS  During his time at ICNRUS, Dorodny's

22  impressions of the company remained essentially unchanged  Dorodny allegedly shared these

23  views regularly with the head of ICNRUS, John Ortega, as well as expressing them at least once

24

25         [2]Plaintiffs claim that Dorodny's interests at this point actually converged with ICN's
26  because he would be paid a percentage of the purchase price and would, therefore, have an
   incentive to give a higher valuation  (SCAC ¶ 69(b)(ii) )  Of course, as a purchasing broker,
27  Dorodny would presumably have fiduciary duties to his client, Gazprom, to try to achieve a
   lower price for the assets to be purchased  The Court trusts that Plaintiffs did not mean to imply
28  that their essential witness would breach fiduciary duties for his own personal gain

1   to Defendant Bill MacDonald in May 2001  Dorodny also claims to have direct knowledge that

2   Defendant Panic was aware of these problems since Panic was present at two meetings in May

3   2001 where ICNRUS problems were discussed and was copied to several e-mail messages about

4   ICNRUS problems

5       It is also important to keep the requirements of GAAP in mind when evaluating Plaintiffs'

6   allegations related to the impairment of Russian assets  As the Seventh Circuit has noted, "If all

7   that is involved is a dispute about the timing of the writeoff  we do not have fraud, we may not

8   even have negligence " *DiLeo v  Ernst & Young*, 901 F 2d 624, 627 (7th Cir  1990)  While the

9   proper application of GAAP provisions is, in the end, a question of fact, in order to evaluate

10  whether Plaintiffs have raised a strong inference of scienter in a pure accounting fraud, a Court

11  would seemingly have to look at the GAAP provisions  In this regard, the Court respectfully

12  disagrees with *Florida State Bd  of Admin  v  Green Tree Financial Corp* , 270 F 3d 645, 666

13  (8th Cir  2001), where the Eighth Circuit rejected defendants' argument that complex accounting

14  should undercut a finding of scienter  The Eighth Circuit stated  "Undoubtably, the accounting

15  issues are complex, whether they were handled within the parameters of good faith decision-

16  making or whether the decisions amounted to recklessness will surely be the focus of any trial of

17  this case  We will not prejudge the issue "  *Id*   In this Court's opinion, disregard for the

18  complexity of accounting provisions at issue in a securities fraud case is contrary to Ninth

19  Circuit law requiring courts to "consider all reasonable inferences to be drawn from the

20  allegations, including inferences unfavorable to the plaintiffs "  *Gompper v  Visx, Inc* , 298 F 3d

21  893, 897 (9th Cir  2002)  If the accounting rules are complex as applied to the transactions at

22  issue, or appear on their face to be contrary to the application that Plaintiff alleges, this would

23  certainly be an inference unfavorable to a finding of scienter

24      Plaintiffs do not allege that Dorodny is an accounting expert, they only allege that he is

25  experienced in valuing industrial property  Therefore, the Court sees no reason to obligate ICN

26  to defer to Dorodny's judgment on accounting matters  Plaintiffs argue that SFAS 144 requires

27  assets to be reviewed for impairment annually  However, this interpretation of has no support in

28  the text of SFAS 144 itself and Plaintiffs plead no other accounting authorities in favor of this

1  position   The Court cannot find a "strong inference" of scienter in violating SFAS 144 when

2  Plaintiffs have not pled any reason why Defendants should have been on notice of the strained

3  interpretation Plaintiff seeks to place on SFAS 144 even if that interpretation turns out to be

4  "correct" at trial

5        Statement of Financial Accounting Standards ("SFAS") 144, on its face, only requires

6  impairment when "events or changes in circumstances indicate that [the asset's] carrying amount

7  may not be recoverable "  Plaintiffs make no effort to show the kind of triggering "events or

8  changes in circumstance" that would have led ICN to initiate a writeoff of the allegedly impaired

9  assets   In fact, the allegations in the SCAC imply that the assets were overvalued by ICN from

10  the time that they were purchased   There are simply no statements in the SCAC describing any

11  changes in circumstances that would have clearly prompted ICN to reconsider the value of the

12  assets   In the absence of such events, Plaintiffs must plead some facts from which the Court can

13  draw a strong inference that ICN was engaging in fraudulent activities rather than simply being

14  slow in coming to the realization that it made poor business decisions and now owned property

15  that was not worth what it originally paid   The mere fact that a single person – Dorodny – told

16  ICN that the assets were hopeless does not add up to a strong inference of scienter

17        To reiterate, Plaintiffs have made no allegations that would demonstrate that ICN had an

18  obligation under GAAP to impair its assets at a specific earlier time but chose not to do so with

19  an intent to defraud or with recklessness as to misleading investors   Unlike a case in which the

20  court found sufficient pleading detail, Plaintiffs have failed both to substantiate that Defendants

21  committed a violation of GAAP and have failed to provide detailed evidence of the

22  contemporaneous decision-making behind the alleged accounting errors that would combine to

23  show the required scienter   *See In re Adaptive Broadband Sec  Litig* , 2002 U S  Dist  LEXIS

24  5887, at *41 (N D  Cal  2002)  Plaintiffs have therefore not pled with particularity as required

25  under *Silicon Graphics* and its progeny   Furthermore, even a delinquent write-down of the

26  impaired assets, without anything more, does not state a claim of securities fraud, stating at best

27  a bad business decision   In fact, Plaintiffs admit that, in 2000 and 2001 ICN expanded its

28  manufacturing and distribution network to become a leading pharmaceutical company in Russia,

1  cut its losses from $17 million to $4 million, and improved its market position  Given these
2  facts, it is equally plausible that ICN did not impair assets during the Class Period because it
3  believed that it was successfully addressing problems and its business prospects were bright
4  Plaintiffs have thus not alleged with particularity facts giving rise to a strong inference that the
5  Defendants acted either intentionally or with deliberate recklessness

6      Plaintiffs also point to several non-accounting statements made by Defendants regarding
7  its ICNRUS that were allegedly false or misleading when made  (SCAC ¶¶ 82, 99, 118, 139,
8  146 )  Even assuming that the ICNRUS operation had the problems that Plaintiff points out in
9  the SCAC and that Defendants knew the ICNRUS operations had these problems, Plaintiff has
10  made no connection between the problems and these particular statements  The statements cited
11  (SCAC ¶¶ 82, 99, 118, 139, 146 ) are almost entirely specific statements about particular future
12  investments plans for the Russian market or specific past performance in the Russian market
13  Plaintiffs have made no effort to show that these statements were directly false or to connect the
14  alleged problems in ICNRUS to these particular statements in order to show how those problems
15  made these statements misleading

16      **5. Allegations Concerning ICN's Laser-Based Products**

17      Most of Plaintiffs allegations regarding ICN's laser-based products are virtually identical
18  to the allegations made in their previously dismissed complaint  Therefore, the Court repeats
19  many of the observations from its previous order

20      Plaintiffs allege that ICN hid the fact that its product NLite was flawed and patently
21  inferior to competing laser products from the investing public  The NLite system cost 20-30%
22  more than competing products, which were far superior even when cost was not taken into
23  consideration  Plaintiffs allege that numerous ICN employees stated that the product was deeply
24  flawed and that they were instructed by their superiors to conceal this from ICN's customers
25  Plaintiffs allegations are very similar to allegations dismissed by the court in *In re Vantive Corp*
26  *Sec Litig* and fail on the same grounds

27      Similar deficiencies inhere in the complaint's allegations that the defendants lied
28      when representing that Vantive 'was successfully developing/had successfully

1   introduced Vantive Sales (Version 7) for release ' There are simply no details in
2   the allegations that would make these representations false—allegations that
3   Vantive Version 7 'was not well received by customers, was known to be a
4   'disaster' inside the Company, as several of its software modules did not work
5   properly' that deployment of the product resulted in 'serious problems' for Vantive
6   sales operations, 'requiring the investment of significant management
7   resources   to cure these operational problems' and that Vantive 7 was 'not
8   commercially viable due to defects in the product ' Nor are any corroborating
9   facts alleged, or sources stated, for the allegation that Luongo 'secretly ordered'
10  that Vantive 7 not be sold and that it be used as a pilot product until Vantive 7 5
11  could be introduced "
12  283 F 3d 1079, 1088 (9th Cir  2002)
13      Plaintiffs also allege that ICN would install NLite machines for free and fraudulently
14  book the transaction as a sale, thus inflating the appearance of revenue   ICN would resell
15  defective and expired returned cartridge dye kits used in the NLite machines to another
16  customer, thus creating the appearance of revenue from the cartridge   These allegations are far
17  too general to satisfy the requirements of the PSLRA   Among necessary corroborating facts
18  missing from Plaintiffs complaint are  i) names of customers, ii) dates, times and locations of
19  free uses, returns, or resales, and iii) the amounts by which such transactions purportedly
20  overstated ICN's revenues   See, e g , *Vantive*, 283 F 3d at 1091, *In re Ashworth, Inc  Sec  Litig* ,
21  2000 WL 33176041, at *16-17 (S D  Cal ), *Greebel v  FTP Software, Inc* , 194 F 3d 185, 204
22  (1st Cir  1999)
23      Plaintiffs allege that Defendants made false, non-accounting related statements regarding
24  the Nlite product in June 2001   (SCAC ¶ 71 )  The Court agrees with Defendants that these
25  statements are vague, inactionable puffery intended to help sell product, e g  reasonable investors
26  would not rely on mere assertions that the Nlite product is "revolutionary "
27      Plaintiffs also allege that Defendants made false or misleading statements regarding
28  ICN's acquisition of "CoolTouch" technology  (SCAC ¶ 107 )  The statements that ICN was in

1 position to become a market leader in "non-ablavtive laser technology" were allegedly false

2 because the Nlite products successes were based on false sales and because ICN could not

3 integrate the Nlite and CoolTouch sales forces effectively   Plaintiffs have not met their pleading

4 burden for at least two reasons   First, the "false sales" allegations regarding Nlite are

5 insufficient, as noted above   Second, Plaintiffs have made no attempt whatsoever to show how

6 the mere inability to integrate the sales forces is material to the statements made or that the

7 Defendants possessed the requisite knowledge that they would not be able to integrate the sales

8 forces

9         Finally, Plaintiffs claim that ICN commingled its books with the Photonics division after

10 its spin-off to conceal or obscure losses   These allegations are also devoid of the requisite

11 corroborating details, such as the dollar amounts in question, the nature of the assets, or the

12 identities of ICN employees who allegedly perpetrated acts of fraud

13        Once again, Plaintiffs have made virtually no attempt to add the necessary specificity to

14 their allegations since those allegations were dismissed the first time   Therefore, there is no

15 reason to believe that the deficiencies can be remedied   The Nlite allegations, SCAC ¶¶ 69(c),

16 71, 106, and 107, are dismissed with prejudice

## 6. Allegations Concerning Accounting Fraud

18        GAAP violations must be pled with particularity   *Lovelace v  Software Spectrum, Inc* , 78

19 F 3d 1015, 1021 (5th Cir  1996)   As discussed above, Plaintiffs' allegations are conclusory and

20 do not state the requisite specifics, including particular transactions in which revenues were

21 improperly recorded, including the names of the customers, the terms of specific transactions,

22 when the transactions occurred, and the approximate amount of the fraudulent transactions

23 Most important, Plaintiffs do not state the "approximate amount by which revenues and earnings

24 were overstated"—a necessary "basic detail" in accounting fraud allegations   *Vantive*, 283 F 3d

25 at 1091 (citing *Greebel*, 194 F 3d at 204)

## 7. Allegations Involving Generic Optimistic Statements

27        Defendants correctly point to several allegedly false and misleading statements in the

28 SCAC that are inactionable, generic optimistic statements

1    – "I believe that Russia is an excellent investment place   " (SCAC ¶ 86)

2    – Restructuring would generate "significant gains and profitability" (SCAC ¶ 93 )

3    – Panic described "the continued good performance of our specialty pharmaceutical

4        business " (SCAC ¶ 103 )

5    – Panic stated that first quarter 2002 results "continue[d] to demonstrate the strength of

6        our operations   In almost every measure of performance in the first quarter, we

7        exceeded expectations and set new records   Our strong performance, coupled with

8        our promise kept to restructure ICN, underscores our commitment to building

9        value for all of our shareholders " Panic also stated that "[t]hese results were not

10       achieved by accident   They are the direct result of the hard work of our

11       employees, led by an experienced management team and independent board "

12       (SCAC ¶ 129 )

13   – Panic also noted that "ICN is an enormously successful company,   , the fundamentals

14       of ICN's business, which are strong and continue to grow " (SCAC ¶ 142 )

15       All of these statements are such vague, general statements of optimism that it is difficult

16  to even label them as "false" because they convey so little content   No reasonable investor

17  would have relied on them when evaluating ICN

18       **B. Additional Scienter Allegations**

19            **1. Analysis of Allegations of Insider Trading**

20       Plaintiffs allege that certain sales of ICN stock by Defendants Panic, MacDonald, Meier,

21  and Giordani raise an strong inference of scienter

22       Unusual or suspicious stock sales by corporate insiders may constitute circumstantial

23  evidence of scienter   *Silicon Graphics*, 183 F 3d at 986   A suspicious sale is one that is

24  "dramatically out of line with prior trading practices at times calculated to maximize the personal

25  benefit from undisclosed inside information " *Id* (citing *In re Apple Comp  Sec  Litig* , 886 F 2d

26  1109, 1117 (9th Cir  1989))   "Among the relevant factors to consider are  (1) the amount and

27  percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were

28  consistent with the insider's prior trading history " *Id*

15

1   Three of the four individual Defendants that have been served in this action, Panic,

2   MacDonald, and Giordani each made very large sales of ICN stock between June 11 and June

3   14, 2002  However, these sales are not suspicious enough in amount or timing due to the

4   circumstances surrounding the sales to raise a strong inference of scienter

5   First, and most obviously, Defendants lost control of ICN in a proxy battle on June 11,

6   2002  Clearly the Defendants might have wanted to substantially reduce their exposure to ICN

7   once they were no longer in control  More importantly, according to the Defendants' Form 4s, a

8   large number of stock options held by the individual Defendants became exercisable on June 11,

9   immediately after the change of control  These option trades account for the large majority of

10  the ICN stock sold by the individual Defendants in the June 11-14 timeframe  Prior to June 11,

11  the Defendants could not have exercised these options  This strongly works against any

12  inference of scienter arising from the trades  *See Silicon Graphics*, 183 F 3d at 987-88

### 2. Other Scienter Allegations

14  The Court agrees with the Defendants that the Plaintiffs have not even made an attempt

15  to provide scienter allegations for any of the allegedly false statements except for the ICNRUS

16  allegations  But as the Court noted above, Plaintiffs have fallen far short of pleading fraud in

17  relation to ICNRUS rather than simply mismanagement or a difference of opinion

### C. Totality of the Allegations

19  The Court finds, considering the allegations as a whole, that Plaintiffs have failed to plead

20  with requisite particularity factual allegations of wrongdoing, and factual allegations necessary

21  to establish a strong inference that Defendants acted with the required state of mind

22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

16

**III. DISPOSITION**

For the foregoing reasons, the Court DISMISSES Plaintiffs' Second Consolidated Amended Complaint as to Defendants ICN, Panic, Meier, MacDonald, and Giordani   Leave to amend is granted for the ICNRUS allegations and the Efudex off-label marketing allegations   Leave to amend is denied for the remainder of the complaint   The Court grants Plaintiffs 30 days to amend their complaint

IT IS SO ORDERED

DATED  JUNE 24, 2004

_____
DAVID O  CARTER
United States District Judge

17